**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| COLE D. SIBOLD, | ) | CASE NO. 3:24-CV-1957 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Cole D. Sibold's application for Period of Disability and Disability Insurance Benefits (DIB). Mr. Sibold seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated November 8, 2024.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

In May 2023, Mr. Sibold applied to the Social Security Administration (SSA) seeking period of disability and DIB benefits; he claimed that he became disabled on August 18, 2022. (Tr. 121, 241.)[2] He identified nine allegedly disabling conditions: (1) "stomach problems"; (2) migraines; (3) "liver issues"; (4) "back problems"; (5) anxiety; (6) post-traumatic stress

---

[1] Martin O'Malley resigned as Commissioner of Social Security in November 2024. A series of acting commissioners led the Agency until May 2025, when Frank Bisignano was confirmed as Commissioner.

[2] The administrative transcript appears at ECF No. 5. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 37"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 6") and page-identification numbers (e.g., "PageID# 2452").

disorder; (7) depression; (8) "nerve, left arm losing feeling"; and (9) "losing feeling in right calf." (Tr. 288.)

The SSA denied Mr. Sibold's application initially and upon reconsideration. (Tr. 121–31, 132–40.) Mr. Sibold requested a hearing before an administrative law judge (ALJ). (Tr 165.) The ALJ held a hearing on May 22, 2024, at which Mr. Sibold was represented by counsel. (Tr. 43–73.) Mr. Sibold testified, as did an independent vocational expert (VE). (*Id.*)

On June 18, 2024, the ALJ issued a written decision finding that Mr. Sibold is not disabled. (Tr. 14 –42.)

Mr. Sibold requested review of the ALJ's decision. (Tr. 236–37.) On September 10, 2024, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On November 8, 2024, Mr. Sibold filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Sibold asserts the following assignment of error:

> The ALJ violated 20 C.F.R. § 404.1520c when evaluating the mandatory factors of supportability and consistency of Dr. Soder's treating mental health opinions.

(ECF No. 6, PageID# 2452.)

## III.    BACKGROUND[3]

### A.    <u>Prior Application</u>

Mr. Sibold previously filed an application for disability benefits in July 2021; the application was denied after a hearing in August 2022. (Tr. 81–109.) The agency appeals council denied review of that decision (Tr. 115), and Mr. Sibold did not seek judicial review.

---

[3] During the administrative proceedings, Mr. Sibold alleged that he was disabled as a result of both physical and mental conditions. In this proceeding, he challenges the ALJ's analysis only with respect to mental conditions. I therefore summarize the evidence relating only to his mental-health conditions and limitations.

### B.      Personal, Educational, and Vocational Experience

Mr. Sibold was born in 1984 and was 39 years old on the date of his application. (Tr. 45, 121.) He graduated high school and completed "quite a bit" of college courses. (Tr. 52.) He served the country in military service from 2003 to 2007, supporting both the Navy and the Air Force. (Tr. 53–54.) He has three children, and, at the time of his hearing, he was divorced from his first wife and separated from his current spouse. (Tr. 51.) He currently lives alone. (Tr. 51, 57.) His previous civilian work experience includes factory work, work as a railroad conductor, and work in the receiving department of a hardware retailer. (*See* Tr. 290.)

### C.      Function Report

Mr. Sibold completed a function report in August 2023. (Tr. 299–306.) He identified that his "PTSD has gotten very bad" and wrote that he cannot sleep "and the visions are bad." (Tr. 299.) He complained that anxiety and depression made it hard for him to focus. (*Id.*)

Mr. Sibold wrote that he is sometimes in bed all day because of his body pain, or because he is fighting a migraine headache, or because of his depression. (Tr. 300.) He "tr[ies] to be a dad . . . [a]nd somewhat a husband." (*Id.*) He described having "night terrors" and pain at night that prevent him from resting. (*Id.*) He needs to be reminded to take care of his grooming and personal needs because he gets "confused and forgetful." (Tr. 301.) He is "sometimes" able to "make the same easy meal," but sometimes he cannot even manage that, so he does not eat. (*Id.*) He rarely does household chores, and when he does he often takes longer than he should or does not finish at all. (*Id.*)

Mr. Sibold identified that he was able to drive short distances. (Tr. 302.) He shops for "essentials" both in person and virtually, but he does so "quickly before [he] panic[s]." (*Id.*) He is able to pay bills and handle a savings account, but he has trouble counting change and using a checkbook because he "can't focus." (*Id.*)

3

He said he does not care about hobbies anymore, but he wrote that his "kids are [his] focus." (Tr. 303.) He visits with other people in person, over the phone, and virtually "when [he] feel[s] [he] can," which is weekly. (*Id.*) He does not like going places alone and "feel[s] the panic" when interacting with family, friends, and others. (*Id.*)

Mr. Sibold wrote that he is "a shadow of a person." (Tr. 303.) He identified that he could only pay attention for "seconds to minutes," but he did not know how well he could follow written instructions. (Tr. 304.) He needs spoken instructions repeated "a few times." (*Id.*) He does not handle stress or changes to his routine. (Tr. 305.)

### D.   <u>Relevant Hearing Testimony</u>

#### *1.   Mr. Sibold's Testimony*

Mr. Sibold testified that "[t]hings are getting worse" since his previous disability application. (Tr. 54.) He has begun to "break down" when he sees himself in the mirror, attributing that effect to "body dysmorphia." (*Id.*) He has "audio and visual hallucinations." (*Id.*)

While this opinion focuses on Mr. Sibold's reported mental limitations by virtue of the arguments presented, the Court specifically acknowledges that Mr. Sibold reported that his military service resulted in "multiple injuries," describing that his service at sea was "rough" in that he was "tossed" and "slammed around" "quite a few times." (Tr. 55.)

Mr. Sibold testified that he takes medication for his mental health conditions, which help "keep it in check," although he suffers from side effects including trouble sleeping. (Tr. 56.) He described paranoia, anxiety, and night terrors "a couple times a week" primarily stemming from his time in military service. (*Id.*) He said that he could be awake for the better part of three days at a time. (*Id.*)

Mr. Sibold testified that he has a driver's license. (Tr. 52.) He leaves the house to see his children two to three times per week and goes to a store once per week. (*Id.*) On Saturdays, he is

4

usually able to see all three of his children. (Tr. 57.) He has gone to several track meets for his child, and when he sees them he will usually take them to a park, eat with them, and talk with them. (Tr. 61.)

Mr. Sibold bathes himself at least once every three days and maintains his own hair, shaving his head bald. (Tr. 58.) He is able to prepare simple meals for himself, food that can be cooked in the microwave or "something that takes just a few minutes." (Tr. 59.) He cleans his dishes, although that work is minimal by virtue of the meals he prepares. (*Id.*) Someone else takes care of his yard work, but he cleans the house "[b]it by bit" as he can. (*Id.*) His current spouse usually helps him with groceries, either going with him to the store or helping him use a delivery service. (Tr. 60.) He is able to go the store by himself, but he chooses times when he anticipates there will not be a crowd and uses earplugs or earphones to "keep the sound down." (*Id.*)

Mr. Sibold occasionally goes to a memorial park to sit in solitude and "get some air." (*Id.*) He sometimes plays video games with his child. (Tr. 61.) Most of the time, he merely "stare[s] and zone[s] in and out," sometimes watching streaming television. (*Id.*)

Mr. Sibold "want[s] to work so bad," but he finds that he hallucinates, gets headaches, and gets sick. (Tr. 62.) After his last day working with the railroad company, during which he got sick from a hernia, "[e]verything just started falling to pieces." (Tr. 62–63.)

With respect to hallucinations, Mr. Sibold described that "a couple times in week" or multiple times a day, he will feel like something is behind him or "come face-to-face with someone [he] gunned down ten years ago." (Tr. 64.) He reported having anxiety attacks whenever he goes out of the house or is near people. (*Id.*)

Mr. Sibold testified that "[a]t least every day or so," he feels a combination of physical and emotional limitations that he feels prevent him from getting anything done. (Tr. 66.)

### 2. *Vocational Expert Testimony*

The ALJ asked a vocational expert to assume that an individual with Mr. Sibold's age, education, and experience had the ability to perform light work, although the individual could only occasionally climb ramps and stairs and could never climb ladders, ropes, or scaffolds; could frequently balance but only occasionally stoop, kneel, crouch, or crawl; could frequently reach overhead, handle, and finger with the left, non-dominant upper extremity; would be limited to a moderate level of noise and could not work under strobe or flashing lights and must wear sunglasses if working outdoors in bright sunlight; could never be exposed to concentrated levels of fumes, odors, dusts, or the like; must work in environmental lighting no brighter than that found in ordinary office settings; could never be exposed to moving machinery, unprotected heights, or commercial driving; could perform simple, routine, and repetitive work but not at a production-rate pace; and could tolerate few changes in the workplace and occasionally interact with supervisors workers and coworkers but never with the general public. (Tr. 67–68.)

The expert opined that such an individual could perform the work of a "marker" (DOT 209.587-034), "routing clerk" (DOT 222.687-022), or "sorter" (DOT 222.687-014). (Tr. 68.)

The ALJ next asked the expert to further limit the hypothetical individual to work at the sedentary level. (*Id.*) The expert opined that such an individual could perform the work of an "inspector" (DOT 669.687-014), "touchup screener" (DOT 726.684-110), or "assembler" (DOT 739.687-066). (Tr. 68–69.)

The expert further testified that no competitive work would be available to the individual if the individual were off task 20 percent or more of the workday due to their symptoms. (Tr. 69.) Most employers will tolerate two 15-minute breaks and one 30-minute break during the workday

and up to two absences per month, with the employee on-task for 90 percent or more of the workday. (*Id.*)

In response to questions from Mr. Sibold's counsel, the expert opined that the cited jobs would be eliminated if the individual could interact with coworkers and supervisors "less than occasional[ly]." (Tr. 70.) The expert further opined that the cited jobs are expected to be learned within a month "with little to no help afterwards," so any additional reminders or redirection would not be likely to be tolerated. (Tr. 71.)

### E.     State Agency Consultants

At the initial administrative level, Mr. Sibold's claim was reviewed by a psychologist (Robyn Murry-Hoffman, Psy.D.), a physician (Dr. Gerald Klyop), and a disability examiner (Kyle Yator). (Tr. 121–31.) Dr. Murry-Hoffman concluded that Mr. Sibold had mild limitations with respect to the ability to understand, remember, or apply information and to interact with others. (Tr. 126.) She concluded that he had moderate limitations with respect to the ability to concentrate, persist, or maintain pace and to adapt or manage himself. (*Id.*) She opined that Mr. Sibold had the capability to perform simple, routine, and repetitive tasks in the absence of a production-rate pace. (Tr. 128.) She further opined that Mr. Sibold could tolerate few changes in the work setting, "defined as routine job duties that remain static and are performed in a stable, predictable work environment." (*Id.*) She noted that she had adopted the residual functional capacity from Mr. Sibold's previous disability application pursuant to SSA Acquiescence Ruling 98-4(6). (Tr. 126, 128.)

The agency consultants concluded that Mr. Sibold was capable of performing light, unskilled work such as that required of an "office helper" (DOT 239.567-010), "collator operator" (DOT 208.685-010), or "cleaner, housekeeper" (DOT 323.687-014). (Tr. 129.) They therefore found that Mr. Sibold was not disabled. (Tr. 130.)

7

In a letter to Mr. Sibold explaining its decision, the Agency wrote, "You may at times feel nervous, anxious, or depressed," but "[y]ou are still able to remember and carry out simple work instructions." (Tr. 150.)

At the reconsideration level, Mr. Sibold's claim was reviewed by physician Maria Congbalay, M.D., disability examiner Adam Myers, and psychologist Cindy Matyi, Ph.D. (Tr. 133–40.) Dr. Matyi affirmed the mental health findings from the initial level, noting that they were "supported and consistent with the evidence in [the] file, including updated information obtained at reconsideration." (Tr. 136, 138.)  The consultants affirmed the finding that Mr. Sibold was not disabled. (Tr. 140.)

In a letter to Mr. Sibold explaining this decision, the Agency wrote that he has "some emotional difficulties as a result of [his] psychological impairments" and "may experience emotional problems at times," but that "current evidence shows [he is] able to think, communicate, . . . care for [his] own needs[,] . . . get along with others, do [his] usual daily activities, and remember and follow basic instructions." (Tr. 160.)

### F.   <u>Relevant Medical Evidence</u>

Mr. Sibold underwent an initial psychiatric evaluation with Eula Doering, a certified nurse practitioner, on November 11, 2021. (Tr. 431.) Mr. Sibold complained of "problems with interest, mood, sleep, energy, appetite, self-esteem, and concentration nearly every day and restlessness for several days." (Tr. 432.) He reported nightmares, anxiety, uncontrollable worrying, and irritability. (*Id.*) Ms. Doering started Mr. Sibold on medication. (Tr. 435.)

Mr. Sibold presented to Ms. Doering for medication management on November 27, 2011 and December 11, 2021. (Tr. 419, 437.) He complained that he was not sleeping well, continued nightmares of women watching him, and that his "life situation [was] worse." (*Id.*) In December, he described feeling discouraged and "on autopilot," with frequent feelings of stress and

overwhelm and frequent episodes of crying and worrying. (Tr. 420.) Mr. Sibold denied hallucinations. (*Id.*) He identified his stressors as being denied disability benefits, a strained relationship with his wife, the loss of his ability to work, and his physical pain. (*Id.*) He complained of nightmares. (*Id.*) Mr. Sibold said that he sees his children as often as he can and has an "amazing" relationship with them. (*Id.*)

On examination, Ms. Doering noted that Mr. Sibold was dressed appropriately. (Tr. 421.) He was cooperative, but with intermittent eye contact. (*Id.*) His speech was slow, and his mood was sad, anxious, and irritable. (*Id.*) His thought process was circumstantial, and he displayed poor insight. (*Id.*) His memory was intact, but he had impaired attention. (Tr. 422.) Ms. Doering made medication changes. (Tr. 423.)

Mr. Sibold followed up with Ms. Doering on December 28, 2021. (Tr. 425.) Mr. Sibold said he was having an "OK day" and was having some nights of good sleep. (Tr. 426.) His nightmares had decreased to five days per week (from seven), but his condition was otherwise largely unchanged. (*See* Tr. 426, 428.) Ms. Doering increased the dosage of Mr. Sibold's medication. (Tr. 429.)

Mr. Sibold underwent a diagnostic assessment with Ann Knoderer, LISW, on January 4, 2022. (Tr. 574.) He described significant family stress and identified military trauma, poor appetite, low self-esteem, panic attacks, and trouble focusing, among other things. (Tr. 574–87.)

Mr. Sibold consulted with Shanna Valenti, a qualified mental health specialist, on January 19, 2022. (Tr. 511, 615.) Mr. Sibold was "actively engaged" in the session and participated in the planning of Mr. Sibold's treatment. (Tr. 512.)

On January 25, 2022, Mr. Sibold followed up again with Ms. Doering. (Tr. 443.) Mr. Sibold again reported that he "continue[d] to do a little better." (*Id.*) He reported being "with it" and

productive from 9 a.m. to 1 p.m., reported fewer nightmares (down to between three and five nights per week), and reported eating between one and two meals per day (up from one per day). (Tr. 444.) He complained that he still has "nerves" about leaving the house and still has some trouble with activities of daily living (sometimes because of physical pain and sometimes because "he does not care"), but he said his mood was "overall . . . better." (*Id.*) Ms. Doering made some medication adjustments. (Tr. 448.)

Mr. Sibold consulted with Ms. McDowell on January 27, 2022, during which he described similar symptoms. (Tr. 600.) On examination, Mr. Sibold was assessed to appear psychologically normal, although he presented with depressed mood and anxious affect. (Tr. 602–03.) Ms. McDowell made medication changes. (Tr. 605.)

Mr. Sibold followed up with Christopher Kalb, CNP, for medication-management on February 10, 2022. (Tr. 607.) Mr. Sibold said he had nightmares and trouble sleeping, but he reported that his depression and anxiety were "not to[o] bad" and that his appetite was fair. (Tr. 607.) He had a euthymic mood, and his psychological examination was normal except he exhibited poor insight and judgment. (Tr. 608–09.) Mr. Kalb adjusted Mr. Sibold's medication. (Tr. 612.)

Mr. Sibold consulted with Angelette Ten Hoven, LISW, on February 22, 2022. (Tr. 522.) Mr. Sibold maintained good eye contact, speech, and thought processes, but his mood and affect were "anhedonia/flat." (Tr. 522.) Mr. Sibold reported being "shut off and numb" and complained of depression and anxiety; he continued to focus on his physical issues and family stress. (Tr. 523.) He reported that his medication was not working. (*Id.*)

Mr. Sibold had another appointment with Ms. Ten Hoven on March 29, 2022. (Tr. 524.) He had depressed mood and a flat affect as he described having continued nightmares, including "waking nightmares," and trouble sleeping. (Tr. 524–25.) Mr. Sibold reported being able to care

10

for his infant child and said he "still function[s]," he "just do[esn't] feel things like [he] used to." (Tr. 525.) He recently had trouble at a store and said he does not like to be around crowds. (*Id.*)

At an appointment with Ms. Ten Hoven on April 19, 2022, Mr. Sibold's eye contact was avoidant and, at times, fleeting. (Tr. 527.) His body movement was slow and his thought processes were blocked at times. (*Id.*) He complained of hallucinating smells and visual images when he has not been sleeping. (Tr. 528.) He was especially troubled by the possibility of a custody battle involving his children. (*Id.*)

Mr. Sibold's eye contact was improved when he saw Ms. Ten Hoven on May 17, 2022. (Tr. 530.) Mr. Sibold complained of impaired memory, but Ms. Ten Hoven evaluated that Mr. Sibold had improved in his ability to communicate, direct the conversation, and exchange ideas. (*Id.*) Mr. Sibold's complaints were largely unchanged from the previous appointments. (Tr. 531.)

Mr. Sibold's eye contact, engagement, and ability to communicated continued to improve when he met with Ms. Ten Hoven on June 1, 2022. (Tr. 533.) He reported trying to cook something he had never cooked before (although he made a mistake because he was not paying attention). (Tr. 534.) He reported that he liked routine and stability. (*Id.*) He was coping with his reported memory issues by using notes. (*Id.*) He was trying new things with his children and "looked at a houseboat," as he was looking for a new place to reside. (*Id.*) He continued to describe traumatic experiences from the military. (*Id.*)

Mr. Sibold appeared worse on June 16, 2022, although he improved throughout the session with Ms. Ten Hoven. (Tr. 536.) Mr. Sibold had recently learned that three people he had served with in the military had died by suicide. (Tr. 537.) He reported problems concentrating; he drove himself to the hearing but took several wrong turns. (*Id.*) He continued to have "waking nightmares." (*Id.*)

Mr. Sibold called Ms. Ten Hoven "in crisis" on June 27, 2022. (Tr. 538.) He was calling from a doctor's office, where he had presented for a vasectomy; he was wavering about whether the procedure was the correct option for him. (Tr. 538–39.)

Mr. Sibold met with Ms. Ten Hoven on July 5, 2022. (Tr. 540.) He had decided not to go through with the procedure and said he was "angry about everything." (Tr. 541.) He continued to report feeling tired and like he is "slipping away." (*Id.*)

At his appointment with Ms. Ten Hoven on July 19, 2022, Mr. Sibold reported that his anger was gone but said he was "back to [feeling] nothing." (Tr. 543.) He complained of increased nightmares. (*Id.*)

Mr. Sibold's thought processes showed some improvement at an appointment with Ms. Ten Hoven on August 10, 2022. (Tr. 544.) He continued to describe stress and feelings of hopelessness as a result of his family and housing situation. (Tr. 545.)

Mr. Sibold met with Ms. Ten Hoven again on August 31, 2022. (Tr. 545.) He described frustration about a recent denial of his disability benefits application and said he planned to travel to Missouri to spend some time alone. (Tr. 546.) He had made progress to relocate his belongings in the process of moving out from his current wife, and he said he was coping by listening to music. (*Id.*)

On September 15, 2022, Ms. Ten Hoven assessed that Mr. Sibold's mood and affect appeared to be improved. (Tr. 548.) Mr. Sibold reported positive progress overall but complained of tactile and visual hallucinations and significant trouble sleeping. (Tr. 549.) Mr. Sibold reported that he had started going to a gym. (*Id.*)

Mr. Sibold consulted with Dr. Soder on October 11, 2022. (Tr. 695.) Mr. Sibold said he was "fair" and was feeling good about "getting a couple of his cars fixed." (Tr. 696.) He reported

12

continued hallucinations and trouble with memory but expressed some hope about the idea of a new living situation. (*Id.*)

Mr. Sibold appeared worse to Ms. Ten Hoven on November 2, 2022, as he had recently been diagnosed with a brain tumor and was experiencing financial difficulty due to child support. (Tr. 550.) But he had successfully moved out and had been living alone for a month. (Tr. 551.) He reported continued waking and nighttime nightmares. (*Id.*) But he had dressed up for Halloween and went trick-or-treating with his children. (*Id.*)

Mr. Sibold consulted with Dr. Soder on November 14, 2022. (Tr. 683.) He reported similar concerns, noting that he had a poor memory and other cognitive difficulties. (Tr. 684.) On examination, Mr. Sibold had slowed speech and gait and spoke softly. (*Id.*)

Mr. Sibold reported feeling more alert and oriented during the day at an appointment with Ms. Ten Hoven on November 16, 2022. (Tr. 552.) There had been recent changes to his medications. (Tr. 552–53.) He said he was having "normal days at home," where he was doing chores and playing music. (Tr. 553.) But he continued to have days of struggle, which he coped with by watching movies, playing videogames, and seeing his children. (*Id.*)

Mr. Sibold had a euthymic mood and full affect with Ms. Ten Hoven on December 14, 2022. (Tr. 555.) He was making his bed every day and continued to live on his own, although his anxiety and paranoia were "off the charts." (Tr. 556.) He was sleeping five or six hours a night but continued to have night terrors and visual hallucinations. (*Id.*)

When Mr. Sibold met with Ms. Ten Hoven on January 9, 2023, he described doing exercise and physical training. (Tr. 558.) But he reported having an "aversion to mirrors" and said he had been crying and vomiting. (*Id.*) He acknowledged that his medication had helped him, but he said it made him feel "like a sheep." (Tr. 559.)

Mr. Sibold appeared more stable to Ms. Ten Hoven on January 30, 2023. (Tr. 560.) He had bought a game and gone out to a restaurant to eat. (Tr. 561.) He had been sexually active with several partners since his last session. (*Id.*)

Mr. Sibold remained stable, with full affect and euthymic mood, at his appointment with Ms. Ten Hoven on March 14, 2023. (Tr. 562.) He had purchased an automobile and a motorcycle and had been able to shop online. (Tr. 562–63.) He had been doing things with his family. (Tr. 563.)

Mr. Sibold consulted with Dr. Soder on April 3, 2023. (Tr. 653.) He said he was doing well and had stretches of good days and bad days. (Tr. 654.) He said he tends to avoid things and gets overwhelmed easily. (*Id.*) On examination, Mr. Sibold's mental status was normal with good eye contact and normal speech rate, tone, and volume. (Tr. 654–55.)

By April 25, 2023, Mr. Sibold had been riding his motorcycle and had been to his son's track event. (Tr. 564.) He had taken his automobile to a mechanic twice and expressed a desire to move somewhere warmer. (Tr. 565.)

Mr. Sibold expressed hopelessness with Ms. Ten Hoven on May 17, 2023. (Tr. 566–67.) He reported memory problems but said he would soon be "leaving for a biker weekend." (Tr. 567.)

On June 12, 2023, Mr. Sibold met with Dr. Soder. (Tr. 634.) He reported that his medication changes had "definitely ma[de] a difference," reducing his nightmares and "daymares." (Tr. 635.) He said his mood was more stable, although he was still having some anxiety and "low days." (*Id.*) His mental status exam was largely normal. (Tr. 635.)

Mr. Sibold said he was "living his best life" at the appointment with Ms. Ten Hoven on June 15, 2023. (Tr. 569.) He had attended his son's graduation and reported a better relationship with his wife. (Tr. 568–69.) He continued to feel that he was a "waste" or a "failure." (Tr. 569.)

14

At an appointment with Ms. Ten Hoven on June 29, 2023, Mr. Sibold reported that his aversion to mirrors had gotten worse and that he was not sleeping and having olfactory hallucinations. (Tr. 570.) He had weekly visits with his children and had family coming into town to visit him. (*Id.*)

The visit went well, according to Ms. Ten Hoven's note from an appointment on July 19, 2023. (Tr. 572–73.) He was continuing to ride his motorcycle and said he was no longer dreaming at night. (Tr. 573.)

Mr. Sibold consulted with Dr. Soder on August 21, 2023. (Tr. 2124.) He described that at times he was "not so good" but other times he was "evened out." (Tr. 2125.) He experienced more flashbacks and hallucinations when he ran out of his medication. (*Id.*) But a dosage taken at night helps him into the day. (*Id.*) He described still feeling numb and detached and complained of continued memory problems and uncontrolled anxiety, especially in public places. (*Id.*) On examination, Mr. Sibold's mood was "detached" but his mental-status examination was otherwise largely normal; he had good eye contact and normal psychomotor functions. (Tr. 2125.) Dr. Soder made some medication adjustments. (Tr. 2126.)

Mr. Sibold met with Lisa Scheib at the VA on September 27, 2023. (Tr. 2055.) His examination for generalized anxiety rated as a seven on a scale of zero to twenty-one, rating below the level of "clinically significant." (*Id.*)

Mr. Sibold consulted with Dr. Soder on February 19, 2024. (Tr. 2221.) Dr. Soder identified Mr. Sibold's mood as "not pleasant," but his examination was otherwise normal; his psychomotor functions were normal with a normal speech rate and volume. (Tr. 2223.) His description of his symptomology was not markedly changed from previous appointments.

On May 20, 2024, Dr. Soder completed a checklist medical-source statement. (Tr. 2429–31.) She submitted the statement letter under a cover letter, in which she stated her opinion that Mr. Sibold's "mental health concerns severely limit his ability to work." (Tr. 2428.) She wrote that she has personally observed, "at each of his appointments," that Mr. Sibold has trouble with memory and attention and "exhibits psychomotor slowing and slowed thought process which can make even basic conversations a challenge for him." (*Id.*)

Dr. Soder's medical source statement identified that Mr. Sibold has "marked" limitations with respect to his ability to "work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes," "perform and complete work tasks in a normal work day or work week at a consistent pace," "work in cooperation with or in proximity to others without being distracted by them," "carry through instructions and complete tasks independently," "maintain attention and concentration for more than brief periods of time," "remember locations, workday procedures and instructions," and "tolerate customary work pressures." (Tr. 2429–31.) The form defined a "marked" limitation as one that could be expected to impair Mr. Sibold for 26% to 50% of the work day or work week. (Tr. 2429.) She identified "moderate" limitations (affecting between 11% to 25% of the work day or week) in the remaining identified functional areas, except that Mr. Sibold only had a "mild" limitation with respect to his ability to maintain his personal appearance and hygiene. (Tr. 2429–31.) Nevertheless, Dr. Soder wrote that she thought Mr. Sibold was capable of managing his own funds. (Tr. 2431.)

Dr. Soder further identified that Mr. Sibold would likely have two or more absences per month and opined that his condition was likely to worsen if he is placed under the stress of a full-time work week. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ determined that Mr. Sibold met the insured-status requirements of the Social

Security Act through December 31, 2026, and has not engaged in substantial gainful activity since August 18, 2022 (the alleged disability onset date). (Tr. 18.)

The ALJ next determined that Mr. Sibold had the following severe impairments: (1) degenerative disc disease of the cervical spine with left median neuropathy; (2) mild canal stenosis and left-sided foraminal stenosis; (3) degenerative disc disease of the lumbar spine with spondylosis; (4) migraines; (5) left inguinal hernia status-post hernia repair; (6) irritable bowel syndrome; (7) obesity; (8) major depressive disorder; (9) generalized anxiety disorder; (10) post-traumatic stress disorder; and (11) adjustment disorder with mixed anxiety and depression. (Tr. 20.)

The ALJ also noted that Mr. Sibold had the following non-severe impairments: (1) non-alcoholic steatohepatitis (NASH) liver disease; (2) hemorrhoids and mild inflammation of the rectum; (3) gastroesophageal reflux disease (GERD); (4) status-post pituitary microadenoma, (5) hypothyroidism, and (6) sinus infection. (Tr. 20.) While the ALJ found these conditions to be non-severe, the ALJ noted that he considered all these conditions when determining Mr. Sibold's residual functional capacity. (*Id.*)

The ALJ determined that none of Mr. Sibold's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

In making this decision, the ALJ noted that Mr. Sibold's mental limitations had changed since the prior ALJ's decision, such that Acquiescence Ruling 98-4(6) did not apply.[4] (Tr. 21.) The

---

[4] The ALJ applied Acquiescence Rulings 98-3(6) and 98-4(6) at various points in his analysis. *See* SSA Acquiescence Ruling 98-4(6), 63 Fed. Reg. 29771-01, 1998 WL 274052 (June 1, 1998). No assignment of error is raised relating to the ALJ's application of the rulings. The Social Security Administration rescinded those rulings in December 2024, replacing them with AR 24-1(6) to account for a 2018 published opinion from the U.S. Court of Appeals for the Sixth Circuit, *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). *See* SSA Acquiescence Ruling 24-1(6), 89 Fed. Reg. 92992-02, 2024 WL 4870750.

ALJ further explained that Mr. Sibold has a mild limitation with respect to his ability to understand, remember, and apply information and moderate limitations with respect to his ability to interact with others, concentrate, persist, maintain pace, and adapt and manage himself. (Tr. 22.) The ALJ concluded that the record did not establish that Mr. Sibold had only a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. (Tr. 22–23.) The ALJ noted that Mr. Sibold's mental limitations were reflected in the residual functional capacity. (Tr. 23.)

The ALJ determined that Mr. Sibold had the residual functional capacity ("RFC") to perform light work with a number of additional limitations. (Tr. 23.) Specifically, Mr. Sibold could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps and stairs; he could frequently balance but only occasionally stoop, kneel, crouch, or crawl; he could frequently reach overhead and handle and finger with his left non-dominant upper extremity; he could work in an environment with no more than a moderate noise level as defined by The Selected Characteristics of Occupations (SCO) but could never work under strobe or flashing lights and must be permitted to wear dark glasses when working outdoors in bright sunlight; he could never be exposed to concentrated levels of fumes, odors, dusts, gases, poor ventilation, or other pulmonary irritants; he must work in an environment with lighting no brighter than that found in ordinary office settings; and he can never be exposed to moving machinery, unprotected heights, or commercial driving. (*Id.*) With respect to mental and social limitations, Mr. Sibold was limited to performing simple, routine, and repetitive tasks in work not requiring a production-rate pace (like assembly line work); he could tolerate few changes in the workplace defined as routine job duties that remain static and are performed in a stable, predictable work environment; and he could occasionally interact with supervisors and coworkers but never with the general public. (*Id.*)

18

The ALJ determined that Mr. Sibold was unable to perform his past relevant work as a train conductor, line assembly utility worker team coordinator, shipping and receiving supervisor, pulverize mill operator, tank cleaner, or operations and intelligence assistant. (Tr. 35.)

The ALJ found that Mr. Sibold was 38 years old on the alleged disability onset date and had at least a high school education. (Tr. 36.)

However, the ALJ determined that—considering Mr. Sibold's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that Mr. Sibold could perform, including work as a "marker" (DOT 209.587-034), "routing clerk" (DOT 222.687-022), or "sorter" (DOT 222.687-014). (Tr. 36.) Accordingly, the ALJ determined that Mr. Sibold is not disabled. (Tr. 37.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While

it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.    <ins>Standard for Disability</ins>

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

21

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.   <u>Analysis</u>

In his second assignment of error, Mr. Sibold argues that the ALJ erred in evaluating the opinions of his treating psychiatrist, Dr. Soder. He points out that Dr. Soder had treated Mr. Sibold's mental health conditions for years before completing her May 2024 medical source statement. (Pl.'s Br. at 8, ECF No. 6, PageID# 2458.) He argues that Dr. Soder's opinions in that statement— including that Mr. Sibold would be absent from work more than twice per month and had moderate and marked limitations in a number of functional areas—were supported by a detailed letter explaining those opinions and by the other medical evidence in the record. (*Id.*) He claims that the ALJ's finding that Dr. Soder's opinion was only "somewhat" persuasive was not supported by sufficient evidence. (*Id.* at 11, PageID# 2461.)

The Commissioner defends the ALJ's conclusion, arguing that the ALJ set forth in detail the ALJ's consideration of numerous mental health evaluations conducted by Dr. Soder between 2022 and 2024, which reflected that Mr. Sibold consistently showed adequate hygiene, intact memory, goal-oriented thought processes, and fair insight and judgment, among other normal or mild findings. (Def.'s Br. at 8, PageID# 2475.) The Commissioner further points out that Mr. Sibold's activities of daily living, including that he was able to spend time fixing cars, contradicted the extent of Dr. Soder's opined limitations. (*Id.* at 9, PageID# 2476.) The Commissioner next defends the ALJ's conclusion that treatment record from other providers—like Ms. Scheib—also

contained mental health findings that were inconsistent with Dr. Soder's opined limitations. (*Id.* at 10, PageID# 2477.)

In reply, Mr. Sibold argues that the ALJ focused too heavily on "arbitrary hurdle[s]" to a disability finding, including relying too heavily on Mr. Sibold's ability to live alone or prepare simple meals and the fact that he was never hospitalized for psychiatric concerns. (Reply Br. at 2–3, ECF No. 9, PageID# 2483–84.) Mr. Sibold concedes that the treatment record from other providers reflected "some 'normal' findings," but he contends that the ALJ cherry-picked those findings while downplaying the abnormal findings from those exams. *Id.* at 3–4, PageID# 2484–85; *see also, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *see also Ackles v. Colvin*, No. 3:14-CV-249, 2015 WL 1757474, at *6 (S.D. Ohio Apr. 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

After careful consideration, I agree with the Commissioner.

Because Mr. Sibold filed his disability claim after March 27, 2017, the "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). Instead, the current regulations state that the SSA "will not defer or give any specific evidentiary weight, including

controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

The SSA now considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (*quoting Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022). That is the case here.

With respect to supportability, the ALJ explained that Dr. Soder's opined limitations were inconsistent with her own medical records, in that "treatment records . . . displayed the claimant was consistently cooperative, focused, alert and oriented to person, place, time and situation with eye contact good, hygiene appropriate, psychomotor activity normal, speech normal, thought process goal-directed, insight fair, judgment intact, intelligence average and there was no psychosis or response to internal stimuli upon objective examination at appointments." (Tr. 32–33.)

An ALJ properly addresses supportability by noting that a physician's opinion is inconsistent with the physician's own treatment records. *See Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021) (holding that ALJ addressed supportability factor by noting that physician's opinion was inconsistent with physician's treating notes), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020).

With respect to consistency, the ALJ explained that Dr. Soder's opined limitations were inconsistent with other evidence in the record, namely Mr. Sibold's description that he was "able to live alone, he could prepare his own simple meals, shop for essentials, play video games, ride his motorcycle, spend time with his family and children and work on cars." (Tr. 32.) The ALJ also pointed out places in the record where Mr. Sibold reported that his medication was effective. (*Id.*) The ALJ further noted that Mr. Sibold never required psychiatric hospitalization or emergency room treatment for mental health concerns. *See Merrell*, 2021 WL 1222667 at *7 (holding that ALJ's decision to discount weight given to opinion from treating physician was supported by substantial evidence where opinion was inconsistent with other evidence in the record); *Creter v. Saul*, No. 1:20-cv-00840, 2021 WL 809323, at *11 (N.D. Ohio Mar. 3, 2021) (holding that ALJ

25

did not err where ALJ specifically cited treatment records ALJ believed were inconsistent with treating physician's opinion and explained why).

Mr. Sibold concedes that the ALJ considered both supportability and consistency with respect to Dr. Soder's May 2024 medical source statement. (Pl.'s Br. at 11, ECF No. 6, PageID# 2461; Reply Br. at 1, ECF No. 9, PageID# 2482.) The remaining question is whether the ALJ's conclusions were supported by "'such relevant evidence as a reasonable mind might accept as adequate to support'" those conclusions. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, I am convinced that substantial evidence supports the ALJ's findings and that the ALJ did not err in finding Dr. Soder's medical source statement to be only somewhat persuasive. While Mr. Sibold is correct that the ALJ would have been more accurate if he had said that Mr. Sibold was able to have work *done on his vehicles*, as opposed to suggesting that Mr. Sibold himself performed that work, the ALJ's recitation of the evidence in the record is materially accurate. I find the ALJ's decision to credit Dr. Soder's opinion as to mild and moderate limitations

was reasonable in light of the evidence in the record of continuing anxious mood, reported flashbacks and hallucinations, and dysphoric and flat affect occurring over the course of years even with treatment (often fluctuating based on significant life stressors, including marital separation, the loss of former combat companions, and significant physical diagnoses).

I also find reasonable the ALJ's conclusion that Dr. Soder's opinion about marked, work-preclusive limitations was not supported by the record. To begin with supportability, Dr. Soder's statement that Mr. Sibold displayed trouble with memory and attention and exhibited psychomotor slowing and slowed thought process at *every appointment*, "making even basic conversations a challenge," finds no support in the record. The ALJ correctly summarized her medical records in material part, noting that his mental status examinations were often significantly normal without apparent difficulty communicating. (*See, e.g.*, Tr. 635, 654–55, 2125, 2223.)

With respect to consistency, the ALJ's conclusion that Mr. Sibold's reported activities of daily living were inconsistent with Dr. Soder's opined limitations was supported by substantial evidence. A number of medical records from multiple providers reflect that Mr. Sibold would report significant mental health concerns, including hallucinations, while at the same time discussing that Mr. Sibold was able to live independently, ride his motorcycle (even planning to go to a "biker's weekend"), purchase and obtain mechanical service for multiple vehicles, visit with his family, cook simple meals, obtain new housing with the assistance of U.S. Department of Veterans Affairs, pursue romantic relationships, and navigate a number of complex medical appointments. (*See, e.g.*, Tr. 522, 534, 549, 551, 561–64, 567–70, 573, 602–03, 608–09, 696.)

The ALJ also correctly noted that Dr. Soder's opined limitations were inconsistent with the opinions of the state agency consultants.

I am convinced that a reasonable mind might accept this evidence as adequate to support the ALJ's conclusions and RFC. *See Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Because substantial evidence supports the ALJ's weighing of the evidence with respect to Dr. Soder's opinions, remand is not warranted. *See Jones*, 336 F.3d at 477. To the extent Mr. Sibold believes the ALJ should have weighed the evidence differently and imposed greater limitations, it is not a reviewing court's role to second guess the ALJ's determination. *Id.*

I therefore recommend that the Court overrule Mr. Sibold's assignment of error.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  June 10, 2025                                        /s *Jennifer Dowdell Armstrong*
                                                                          Jennifer Dowdell Armstrong
                                                                          U.S. Magistrate Judge


## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required

by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).